Richard FRASER, et al., Plaintiff,

v.

**NATIONWIDE MUTUAL INSURANCE CO., et al., Defendant.**

**No. CIV.A. 98–CV–6726.**

United States District Court,
E.D. Pennsylvania.

March 27, 2001.

624

Anita F. Alberts, Doylestown, PA, Constance R. Bortnick, Constance R. Lipson, Blank Rome Comisky & McCauley, LLP, Philadelphia, PA, for plaintiff.

Frederick C. Fletcher II, Curtis P. Cheyney, III, Brian K. Hanstein, Philadelphia, PA, for defendants.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

### INTRODUCTION

Plaintiffs Richard Fraser, d/b/a R.A. Fraser Agency ("Fraser") and his wife, Deborah Fraser, filed this action against defendants Nationwide Mutual Insurance Company, Nationwide General Insurance Company, Nationwide Property & Casualty Insurance Company, Nationwide Variable Life Insurance Company, and Colonial Insurance Company of Wisconsin (hereinafter referred to collectively as "Nationwide" or "defendants") in December of 1998 pursuant to federal and Pennsylvania state law. In their Second Amended Complaint, Plaintiffs assert the following theories of recovery based upon the defendants' alleged wrongful conduct: violation of federal and Pennsylvania wiretapping statutes (concerning in transit communication) (Counts I–II); violation of federal and Pennsylvania wiretapping statutes (concerning stored communication) (Counts III–IV); violation of the Article 1 §§ 7 and 20 of Pennsylvania Constitution (Count V); wrongful discharge (Count VI); breach of implied covenant of good faith and fair dealing (Count VII); defamation (Count VIII); breach of contract (Count IX); violation of the Pennsylvania Wage Payment and Collection Law (Count XI); and violation of Pennsylvania Commissioned Sales Representative Act (Count XII). Plaintiffs also seek a declaratory judgment with respect to contractual obligations under Count X of the Second Amended Complaint. Now before me is defendants' motion for summary judgment on all Counts.

This is one of the few cases that has required a court to interpret the wiretapping acts in the context of recent electronic communication technology. Here, there is a claim that the federal and state wiretapping acts, the Wiretap Act and the Stored Communications Act, cover retrieval of a person's e-mail from post-transmission storage. Because I have determined that these Acts protect only communication in the course of transmission, I will grant summary judgement on this claim. As for the other outstanding claims, I will also grant summary judgement. Nationwide, as a private actor, is not subject to Pennsylvania State Constitutional requirements under Article 1; Fraser has not presented a claim for wrongful discharge under the narrow public policy exception to at-will employment; Fraser may not challenge Nationwide's decision to cancel his Agent's Agreement or the Review Board process under a claim for breach of the implied covenant of good faith and fair dealing; and Fraser has not presented a claim for breach of contract under the Agent's Agreement.

## PROCEDURAL BACKGROUND

Plaintiff initiated this action by filing a Complaint on December 28, 1998. On April 9, 1999, plaintiff filed an Amended Complaint. Pursuant to my initial Scheduling Order, all discovery was to be completed by October 1, 1999. On December 10, 1999, I granted an extension of the deadline for discovery until June 30, 2000. On January 24, 2000, I granted plaintiff leave to amend the complaint for a second time. On January 31, 2000, Plaintiff filed a Second Amended Complaint. On June 13, 2000, I granted a second extension of the deadline for discovery until August 15, 2000. On August 31, 2000, defendants timely filed their motion for summary judgment. By a series of stipulations and orders, plaintiffs' time to respond to summary judgment was extended until November 3, 2000. On November 2, 2000, plaintiff filed two motions to compel discovery[1], a motion to mark defendants' counterclaim 'dismissed with prejudice', a motion to vacate the protective order previously entered with regard to "Client A", and a motion for leave to file a Third Amended Complaint. By the latter motion, Fraser seeks to drop six causes of action, add a new cause of action, modify the allegations supporting the claims remaining, and dismiss Mrs. Fraser as a party plaintiff.[2]

On November 3, 2000, plaintiff filed a response to summary judgment in which plaintiff presumed that I would grant the motion for leave to file a Third Amended Complaint. On January 26, 2001, I informed the parties on the record that I would rule on summary judgment before considering plaintiff's subsequent motions. *See* docket entry # 95 for minute entry. On January 29, 2001, I ordered plaintiff's response stricken as non-responsive and allowed plaintiff until February 9, 2001 to file a response to summary judgment. I granted defendants ten days to reply.

On February 9, 2001, plaintiff filed a new response to summary judgment in which he, again, presumed that I would grant his motion to file a Third Amended Complaint.[3] Plaintiff's response did not address defendants' summary judgment motion with respect to Counts VIII (defamation), X (request for a declaratory judgment), XI (Pennsylvania Wage Payment and Collection Law), or XII (Pennsylvania Commissioned Sales Representative Act) of the Second Amended Complaint. Summary judgment on these four counts is, therefore, granted for plaintiffs' failure to respond.

## FACTUAL SUMMARY[4]

Nationwide is a family of insurance companies doing business across the country

---

1. Plaintiffs two discovery motions seek to compel discovery of documents stored electronically on Nationwide's file server, and agendas, minutes, and action items from the cabinet or staff meetings of Nationwide's Property and Casualty company ("P & C").

2. Subsequent to filing the motion for leave to file the Third Amended Complaint, plaintiff submitted a letter stating that he no longer wished to drop Counts I and II of the Second Amended Complaint, citing recently decided case law from the Ninth Circuit.
 The claims listed in plaintiff's proposed Third Amended Complaint are: (Count I–II) violation of federal and Pennsylvania wiretap-

ping statutes (stored communication); (Count III) violation of Article I, Sections 7 and 20 of the Pennsylvania Constitution; (Count IV) wrongful discharge; (Count V) breach of contract; (Count VI) conversion/invasion of privacy.

3. Plaintiff also filed a Rule 56(f) motion requesting that I rule on plaintiff's discovery motions filed on November 2, 2001 before ruling on summary judgment.

4. This summary includes only those facts that are relevant to my rulings on summary judgment. In accordance with the summary judg-

and headquartered in Columbus, Ohio. Fraser joined Nationwide as an employee in 1986. Subsequently, on or about March 1, 1986, Fraser signed the standard Agent's Agreement to become an exclusive career agent with Nationwide. *See* Plaintiff's Appendix in Support of Their Opposition to Defendant's Motion for Summary Judgment ("Appendix") Vol. 1 at 1.

The Agent's Agreement states that "the parties agree that the purpose of this Agreement will be best served by your acting as an independent contractor. Therefore, it is agreed that you are an independent contractor for all purposes." *Id.* Upon assuming this status, Fraser obtained considerable freedom as to when, how and where he operated his agency. Fraser was committed under the agreement to represent Nationwide exclusively in the sale and service of insurance. Such exclusive representation is defined in the Agreement to mean "that you will not solicit or write policies of insurance in companies other than those parties to this Agreement, either directly or indirectly, without written consent of these Companies." *Id.* at 2.

The agreement further states that the agent or Nationwide have "the right to cancel this Agreement at any time" upon written notice. *Id.* at 2. The provision on cancellation of the agreement includes a statement that "the Agent shall have access to the Agents Administrative Review Board, and its procedures, as it may exist from time to time." *Id.* The agreement provides for payment of earned deferred compensation upon "qualified cancellation"

of the agreement.[5] However, the agent forfeits his right to deferred compensation under paragraph 11(f) of the Agreement if, among other things, he accepts employment with a competitor of Nationwide within one year of cancellation and within a twenty-five mile radius of the agent's business location at the time of cancellation.

On January 23, 1990, Fraser entered into an Agency Office Automation Lease Agreement with Nationwide whereby Fraser leased computer hardware and software from Nationwide for use in the automation of his office and insurance business. The lease agreement explicitly stated in the Preface that the Agency Office Automation ("AOA") system "will remain the property of [Nationwide]." Defendant's Motion for Summary Judgment ("Defendant's Motion"), Ex. C. All enhancements or software necessary to operate the system were to be provided by Nationwide, and Nationwide assumed responsibility for all system maintenance and repairs. *See id.* at 2. Anytime that someone logged on to the AOA system, a notice appeared on the screen that said:

> "Please note: for everyone's mutual protection, AOL SYSTEM [6] use, including electronic e-mail, MAY BE MONITORED to protect against unauthorized use."

Appendix, Vol. 1 at 201. Fraser was charged a monthly fee for use of the system and was responsible for any damage to the hardware caused by negligence. The lease automatically renewed annually, unless notice to cancel was given by either

---

ment standard, the facts are read in a light most favorable to the plaintiff.

**5.** "Qualified cancellation" is defined in the Agreement as cancellation for any reason, "unless you have induced or attempted, either directly or indirectly, policyholders to lapse, cancel, or replace any insurance contract in

force with [Nationwide]." Plaintiff's Appendix, Vol. 1 at 5.

**6.** In 1996, new software and hardware were employed and at that time, the AOA system was re-named the AOL system. *See* Defendant's Motion at 4.

party, and it automatically terminated upon cancellation of the Agent's Agreement. The lease agreement signed by Fraser remained in effect until his Agent's Agreement was cancelled in September, 1998.

Nationwide produced a handbook called the Agency Compensation and Security Handbook ("CASH").[7] The handbook explicitly states that it is not part of the contractual agreement between Nationwide and its agents. Towards the front of the CASH book, the following language appears:

"The contents of the Handbook are presented as a matter of information only. The only contractual matters are those expressed in your Agent's Agreement and specifically incorporated by reference made within that contract ... The language used in this handbook, is not intended to create nor is it to be construed to constitute a contract between Nationwide and any or all of its employees, agents or officers."

Defendant's Motion, Ex. G.

In June of 1996, Fraser and other Nationwide agents met to form a Pennsylvania chapter of the Nationwide Insurance Independent Contractors Association ("NIICA"). NIICA had previously been in existence for some years in other states. Nationwide refused to officially acknowledge NIICA. At the second meeting of the Pennsylvania chapter of NIICA, Fraser was elected to an office of the chapter. He was also asked to create and write a chapter newsletter, which became known as *The Pennsylvania View.*

One of NIICA's overarching goals is to preserve and defend the status of the Nationwide exclusive career agent as independent contractors. Members of NIICA sought increased state regulation of the insurance industry to protect their independence and maintain control over their work. For example, from 1996–1998, NIICA lobbied state legislators to obtain passage of "just cause" legislation that would insure that agent contracts could not be terminated without "just cause". They also sought remedies to prevent Nationwide from engaging in business practices that, in the agents' independent judgment, were illegal. *The Pennsylvania View* publicly criticized these practices.

In the Fall of 1996, Fraser raised some of the business practices believed to be illegal with Nationwide's Office of Ethics. Thereafter, Fraser initiated a complaint with respect to these practices with the Pennsylvania Insurance Department and the Pennsylvania Legislature. The agents' ongoing efforts to report these practices resulted in media publicity. Nationwide was aware that Fraser and other NIICA members were reporting business practices to state authorities. In April of 1998, Nationwide entered into a series of consent orders with the Pennsylvania Insurance Department, by which Nationwide paid a fine and agreed to cease the business practices about which Fraser had complained. *The Pennsylvania View* publicized Nationwide's concessions under the consent order.

Nationwide was also aware of NIICA's ongoing lobbying efforts to obtain "just cause" legislation. On January 26, 1998, Nationwide's Vice President of Government Relations described the situation with NIICA in an interoffice memo as "significantly accelerating and deteriorating." Appendix, Vol. 1 at 51. In July of 1998, the Pennsylvania Insurance Depart-

---

**7.** In the Second Amended Complaint, Fraser avers that Nationwide assumed additional contractual obligations in the CASH.

ment expressed an official opinion against the proposed "just cause" legislation. The proposed legislation ultimately failed in state legislature's Summer session of 1998.

In August, 1998, Nationwide drafted a warning memo headed "Inappropriate Communication" to Fraser. Appendix Vol. 1 at 141. The memo stated that Nationwide was aware of Fraser's communications with the Pennsylvania Insurance Department and the State Attorney General. Citing examples of such communications, the memo asserted that many of these communications included "false statements or unsupported allegations that Nationwide has or intends to violate the law," and that they "have had a damaging effect on the business operations and reputation of Nationwide and its agents." *Id.* The letter also stated that:

"Nationwide recognizes and respects your right as a citizen to communicate with government agencies and the public. However, you do not have the right to make false statements or accuse Nationwide of wrongdoing, unless your allegations are reasonably supported by the facts and the law. Such actions will not be tolerated, and if they occur in the future, Nationwide intends to exercise its legal rights, which could include legal proceedings in addition to canceling your Agent's Agreement."

*Id.* This memo was intended as a warning. It was in fact never sent to Fraser. A general warning letter about "inappropriate communications" with state insurance departments, the media, and legislatures was issued to the entire agency force on August 12, 1998. Appendix, Vol. 1 at 143.

These events occurred in the context of Nationwide's implementation of new business policies in 1998, to which Fraser and other agents were opposed. The policy changes were related to Nationwide's new publicized growth plan to establish "multiple distribution channels." Under the new plan, policyholders could buy insurance directly, rather than through an agent. *See* Appendix Vol. 4 at 825. The agents feared that the new policies would undermine their work and their independence.

By late July, 1998, the Pennsylvania chapter of NIICA, including Fraser, decided to make Nationwide's management in Columbus aware of the agents' opposition to the plan. NIICA members asked Fraser to prepare a letter to competitors of Nationwide to solicit interest in acquiring the policyholders of the approximately two hundred NIICA members in Pennsylvania. In drafting the letter, the agents' did not intend to actually separate from Nationwide, but to send a warning that they would leave if Nationwide did not cease the objectionable policies. This letter was ultimately sent to at least one competitor.

Roy Bowerman, Nationwide's Pennsylvania Sales Officer, learned of the proposed letter drafted by Fraser to Nationwide's competitors from a NIICA member and asked for a copy of it. Pennsylvania NIICA's leadership decided to make it available after first removing the NIICA letterhead. NIICA members informed Nationwide that the letter was intended merely as a pressure tactic. A NIICA agent faxed the letter to Bowerman on July 31, 1998, and the letter ultimately reached Richard Crabtree, a top-ranking executive of Nationwide. Copies were also sent to other top executives. The warning memo to all agents regarding "inappropriate communications" was sent soon after these events, on August 12, 1998. A copy of the letter to Nationwide's competitors drafted by Fraser was also given to Cynthia Tolsma, Pennsylvania State Officer and Vice President of Nationwide. This copy was not anonymous. It contained both NIICA and Fraser's names.

Nationwide did not know whether or not this letter drafted by Fraser had actually been sent to Nationwide's competitors. On August 27, 1998, Nationwide's director of electronic communications in Columbus, Gregory Ricker, in the presence of Nationwide's assistant general counsel, Randall Orr, searched Nationwide's electronic file server for e-mail communication indicating whether or not the letter had been sent. Ricker opened the stored e-mail of Fraser and other agents. Ricker ultimately found an exchange of e-mails from August 25, 1998 between Fraser and Lon McAllister, an agent of Nationwide at the time, indicating that the letter had been sent to at least one competitor. *See* Appendix, Vol. 1 at 196–97. This e-mail was retrieved from McAllister's file of already received and discarded messages stored on the server. *See* Appendix at 368–70 (deposition testimony of Randall Orr). The messages retrieved from Nationwide's storage site had already been sent by Fraser and received by McAllister.[8]

On September 2, 1998, Nationwide cancelled Fraser's Agent's Agreement. Thereafter, in accordance with the terms of the AOA Lease Agreement, Nationwide secured its computer hardware and software property leased by Fraser. Pursuant to the Agent's Agreement, Fraser immediately appealed the cancellation to the Review Board and a hearing was set for September 16, 1998. The Review Board was composed of two agents and two management representatives. A witness for management represented Nationwide's position that, under the Agent's Agreement, Nationwide had the right to terminate its relationship with Fraser for any reason or no reason at all, and that, nevertheless, Fraser's breach of loyalty to the company

provided them with a good reason to terminate him. *See* Appendix Vol. 1 at 186–93. Fraser argued to the Review Board that he was terminated in retaliation for his NIICA activities. After hearing management's and Fraser's position on his termination, the Board split two to two on whether to uphold the termination.

Fraser's appeal was then referred to Cynthia Tolsma. Tolsma received the Review Board's split decision in a report. The report listed some of the points raised by the Board in arriving at the split decision. The points raised include:

> "the agent made a personal choice admitting that he did send a letter to Erie Insurance"
>
> "the agent admits that he used very bad judgment in taking this action"
>
> "the action appeared to be prompted by the environment that existed among the agent force . . . and was originally aimed at sending a message to Nationwide management"
>
> "evidence strongly supports that management obtained the information through questionable methods"
>
> "the board felt that management is using him as a sacrifice or warning to others"
>
> "the members of the board felt the matter could have been handled better by management and may have warranted a warning or suspension or notice rather than a cancellation"

Appendix Vol. 2 at 203. Tolsma informed Fraser on September 21, 1998 that she had decided to uphold the cancellation of his Agent's Agreement.

---

8. Plaintiff has produced no evidence to refute Orr's deposition testimony that Fraser's e-mail was retrieved from McAllister's file of already received and discarded messages stored on the server.

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The court must determine whether there are factual issues that merit a trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate if no factual issues exist and the only issues before the court are legal. *See Sempier v. Johnson and Higgins*, 45 F.3d 724, 727 (3d Cir.1995).

At summary judgment, the nonmoving party receives the benefit of all reasonable inferences. *See Sempier*, 45 F.3d at 727. The nonmoving party, however, must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538. The party opposing summary judgment "may not rest upon mere allegations, general denials, or . . . vague statements." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991). The court may grant summary judgment if the non-moving part fails to make a factual showing "sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The motion should be granted if the record taken as a whole "could not lead a rational trier of fact to find for the nonmoving party, [and] there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

### DISCUSSION [9]

#### A. The Wiretap Act and the Stored Communications Act (Counts I–IV)

Counts I and II of the Second Amended Complaint allege that Nationwide unlawfully intercepted Fraser's e-mail communication when it retrieved his e-mail from Nationwide's electronic storage sites, in violation of the Federal Wiretap Act, 18 U.S.C. § 2511 *et seq.* and the Pennsylvania Wiretap Act, 18 Pa.C.S. § 5702 et seq. Counts III and IV of the Second Amended Complaint allege that Nationwide unlawfully accessed Fraser's e-mail from storage, in violation of the federal and state Stored Communications Acts, 18 U.S.C. § 2701 *et seq.*, and 18 Pa.C.S. § 5741.[10] Defendants argue that summary judgment should be granted on Counts I–IV.

The Wiretap Act and the Stored Communications Act are derivatives of the original Wiretap law enacted in 1968. Both Acts were enacted in the Electronic Communications Privacy Act of 1986, Pub. L. No. 99–508, 100 Stat. 1848 ("ECPA")

---

**9.** Plaintiff contends and has presented some evidence to show that Fraser's status as an independent contractor was undermined by Nationwide's policy changes starting in 1994. *See* Plaintiff's Renewed Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Response") at 9–12. Plaintiff responds to summary judgment on some counts by asserting Fraser's status as an independent contractor and on other counts by asserting Fraser's status as an employee of Nationwide. For purposes of summary judgment, I will view the evidence regarding Fraser's status in the light most favorable to Fraser on each count.

**10.** Because courts have interpreted the state and federal Wiretap and Stored Communications Acts the same with respect to a determination of liability, my disposition of counts I–IV will rely primarily on the federal law. *See, e.g., Gross v. Taylor*, 1997 WL 535872 *4, n. 2 (E.D.Pa.1997). Both parties agree with this assertion. *See* Defendant's Motion at 41 n. 11; Plaintiff's Response at 28.

"to update and clarify Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies." S.Rep. 99–541, reprinted in 1986 U.S.C.C.A.N. 3555. The ECPA added "electronic communication" both to the definition of the Wiretap offense and to the definition of "intercept". The Wiretap Act protects against unauthorized "interception" of "electronic communications" 18 U.S.C. § 2511.[11] The Stored Communications Act, protects against unauthorized "access" to "electronic communication while it is in electronic storage." 18 U.S.C. § 2701.[12]

The ECPA has been noted for its lack of clarity. *See, e.g., United States v. Smith,* 155 F.3d 1051, 1055 (9th Cir.1998), *cert. denied,* 525 U.S. 1071, 119 S.Ct. 804, 142 L.Ed.2d 664 (1999) (citing *Steve Jackson Games, Inc. v. United States Secret Service,* 36 F.3d 457, 462 (5th Cir.1994)). Courts and scholars have struggled to determine the precise boundaries of and also the intended relationship between the Wiretap Act and the Stored Communications Act by looking to the language of the statute, legislative history, and a basic understanding of communication technology. *See, e.g., Jackson,* 36 F.3d 457; *Wesley College v. Pitts,* 974 F.Supp. 375 (D.Del. 1997); *Konop v. Hawaiian Airlines, Inc.,* 236 F.3d 1035 (9th Cir.2001); Tatsuya Akamine, *Proposal for a Fair Statutory Interpretation: E–Mail Stored in a Service Provider Computer is Subject to an Interception Under the Federal Wiretap Act,* 7 J.L. & Pol'y 519, 528 (1999). In this case, I am required to decide whether Nationwide's alleged conduct constitutes an "interception" of an electronic communication under the Wiretap Act, unlawful "access" to an electronic communication under the Stored Communications Act, a violation of both Acts, or a violation of neither Act.

This decision requires a basic understanding of how electronic communication, and in particular, how e-mail communication works. Transmission of e-mail from the sender to the recipient through an electronic communication system ("the system") is indirect. *See* David J. Loundy, *E–Law 4: Computer Information Systems Law and System Operator Liability,* 21 Seattle U.L.Rev. 1075, 1145 (1998) (explaining that all e-mail is stored at some point during the transmission process). First, an individual authorized to use the system logs on to the system to send a message. After a message is sent, the system stores the message in temporary or intermediate storage. I will refer to this storage as "intermediate storage". After a message is sent, the system also stores a copy of the message in a separate storage for back-up protection, in the event that the system crashes before transmission is completed. *See* Peter Schnaitman, *Building a Community Through Workplace E–Mail: The New Privacy Frontier,* 5 Mich.Telecomm. & Tech.L.Rev. 177, 179–80. I will refer to

---

**11.** The Wiretap Act provides a civil cause of action against "any person who—(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1).

**12.** The Stored Communications Act establishes civil liability of one who:
"(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or
(2) intentionally exceeds an authorization to access that facility;
and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system ..."
18 U.S.C. § 2701(a).

this storage as "back-up protection storage". In the course of transmission from the sender to the recipient, a message passes through both intermediate and back-up protection storage.

Transmission is completed when the recipient logs on to the system and retrieves the message from intermediate storage. After the message is retrieved by the intended recipient, the message is copied to a third type of storage, which I will call "post-transmission storage".[13] A message may remain in post-transmission storage for several years. *See id. See also,* George B. Delta and Jeffrey H. Matsuura, *Law of the Internet,* § 6.02 at 6–14.1, 6.16 (2000–2 Supplement).[14]

### (1) "Interception" under the Amended Wiretap Act

The term "intercept" was interpreted under the original Wiretap Act to require that acquisition of the communication be contemporaneous with the transmission or transfer of information from the sender to the recipient. *See United States v. Turk,* 526 F.2d 654 (5th Cir.1976), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976) (holding that there was no interception when the police listened to a tape of a telephone conversation previously recorded by one of the parties to the conversation). "Intercept" is defined in the Wiretap Act as "the aural[15] or other acquisition

of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). "Electronic communication" is defined in the statute as "any *transfer* of signs, signals, writing, images," etc. 18 U.S.C. § 2510(12) (emphasis added). Thus, by inserting the definition of "electronic communication" into the definition of "intercept", "intercept" is defined as the "acquisition" of the contents of any "transfer" of information from sender to recipient. As stated in *Turk,* under the terms of the statute, the acquisition must be during the transfer, or during the course of transmission.

■ This definition is consistent with the common meaning of "intercept".[16] The common meaning of "intercept" is "to stop, seize, or interrupt in progress or course before arrival." *Webster's Ninth New Collegiate Dictionary* 630. With respect to communication, the "progress or course" is the transmission of a message from the sender to the recipient. Acquisition must occur "before arrival". Thus, interception of a communication occurs when transmission is interrupted, or in other words when the message is acquired after it has been sent by the sender, but before it is received by the recipient. The point in time when the message is acquired is the determining factor for whether or not interception has occurred.[17] The Wiretap Act pro-

---

**13.** Post-transmission storage is similar to placing regular mail ("snail mail") in a file cabinet for long-term safekeeping.

**14.** For the junior high explanation of how e-mail works, see Marshall Brain, *How Stuff Works: How E-mail Works* (1998–2001), at *http://www.howstuffworks.com.*

**15.** "Aural" means "of or relating to the ear or to the sense of hearing". *Webster's Ninth New Collegiate Dictionary* 116 (Frederick C. Mish, et al., Merriam–Webster Inc.) (1984).

**16.** *See Williams v. Taylor,* 529 U.S. 420, 421, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) ("A statute's words must be given their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import.") (citations omitted).

**17.** For example, if the recipient of a letter sent by U.S. Mail opens and reads the letter, and a third party subsequently retrieves the opened letter from the desk of the recipient, there is no "interception". In contrast, if a third party removes the letter from the recipient's mailbox before the recipient has re-

vides protection for private communication only during the course of transmission.[18]

The meaning of "interception" does not change when the communication is indirect, passing through storage in the course of transmission for sender to recipient. For example, voice-mail communication is sent by recording a message into the recipient's voice-mail mailbox. The message then remains in storage in the recipient's mailbox until the recipient retrieves it from his or her personal mailbox by calling the voice-mail system. After listening to the message, the recipient may either delete it from the mailbox or save it for some period of time. If a third party obtains access to the recipient's personal mailbox and retrieves a saved message after the recipient has heard the message, there is no interception. The third party's acquisition of the message from storage occurred after the message had been transmitted from the sender to the recipient. On the other hand, if a third party obtains access to the recipient's mailbox and retrieves a message before it has been heard by the recipient, there is interception. *See Smith*, 155 F.3d 1051 (holding that interception had occurred when the defendant retrieved a voice-mail message from the recipient's personal mailbox before it had been received by the recipient and forwarded it to her own personal mailbox).

■ In an e-mail communication system, as in a voice-mail communication system, a message passes through intermediate storage in the course of transmission. In both an e-mail communication system and a voice-mail communication system, a message also may be saved in storage for period of time after transmission is complete. Retrieval of a message from storage while it is in the course of transmission is "interception" under the Wiretap Act; retrieval of a message from storage after transmission is complete is not "interception" under the Act. The only relevant difference between a voice-mail system and an e-mail system is that e-mail is stored in two different types of storage during the course of transmission—intermediate storage and back-up protection storage. Retrieval of an e-mail message from either intermediate or back-up protection storage is interception; retrieval of an e-mail message from post-transmission storage, where the message remains after transmission is complete, is not interception.

■ In this case, it is undisputed that Nationwide acquired Fraser's e-mail by retrieving it from Nationwide's electronic storage facility in Columbus, Ohio. At the time that Nationwide acquired Fraser's e-mail, the e-mail had already been received by the recipient. Fraser does not allege that Nationwide retrieved his e-mail communication before it was received and read by the recipient. Nationwide acquired Fraser's e-mail from post-transmission storage, after transmission was complete. Therefore, there was no "interception".

**(2) Unauthorized "access" under the Stored Communications Act**

■ The Stored Communications Act, which prohibits unauthorized "access" to

trieved and read the letter, there is "interception".

18. Other courts have agreed that "interception" can only occur during the transmission process. *See, e.g., United States v. Meriwether*, 917 F.2d 955, 960 (6th Cir.1990) ("Congress contemplated dealing only with "transmissions" which were unlawfully intercepted"); *Steve Jackson Games, Inc. v. United States*

*Secret Service, et al.*, 36 F.3d 457, 463 n. 8 (5th Cir.1994) (noting the "distinctions Congress intended to draw between communications being transmitted and communications in electronic storage"); *United States v. Reyes*, 922 F.Supp. 818, 836 (S.D.N.Y.1996) ("the acquisition of the data [must] be simultaneous with the original transmission of the data").

an electronic communication while it is in "electronic storage" similarly provides protection for private communication only during the course of transmission. "Electronic storage" is defined under the Act as:

"(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and

(B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication."

18 U.S.C. § 2510(17). Part (A) of the definition fits what I previously defined as "intermediate storage". It is clear that the Stored Communications Act covers a message that is stored in intermediate storage temporarily, after the message is sent by the sender, but before it is retrieved by the intended recipient.

Part (B) of the definition refers to what I previously defined as back-up protection storage, which protects the communication in the event the system crashes before transmission is complete. The phrase "for purposes of backup protection of such communication" in the statutory definition makes clear that messages that are in post-transmission storage, after transmission is complete, are not covered by part (B) of the definition of "electronic storage". Therefore, retrieval of a message from post-transmission storage is not covered by the Stored Communications Act. The Act provides protection only for messages while they are in the course of transmission.

The facts of this case are that Nationwide retrieved Fraser's e-mail from storage after the e-mail had already been sent and received by the recipient. Nationwide acquired Fraser's e-mail from post-transmission storage. Therefore, Nationwide's conduct is not prohibited under the Stored Communications Act.

### (3) *Konop* is distinguishable.

In arguing that it should be controlling, Fraser was seduced by the recent Ninth Circuit opinion in *Konop*. 236 F.3d 1035. In *Konop*, the Ninth Circuit was also presented with whether certain alleged conduct is covered by the Wiretap Act, the Stored Communications Act, neither, or both. The plaintiff in *Konop* was an airline pilot for Hawaiian Airlines ("Hawaiian") who owned and maintained a secure website where he posted bulletins critical of Hawaiian, its officers, and his incumbent union. Konop controlled access to his website by requiring visitors to log in with a user name and password. He provided user names to certain Hawaiian employees, but not to managers or union representatives. To obtain a password and view the website, an eligible employee had to register and consent to an agreement not to disclose the website's contents. Konop filed suit against Hawaiian when he learned that the Vice President of Hawaiian obtained repeated access to the contents of Konop's website by logging on under the names of two different Hawaiian pilots. Konop claimed that Hawaiian, "by accessing Konop's secure website under false pretenses, intercepted an electronic communication in violation of the Wiretap Act, [18 U.S.C. § 2511], and accessed an electronic communications facility in violation of the Stored Communications Act." 236 F.3d at 1042. The court, informed by both legislative history and knowledge of how electronic communication works, held that Hawaiian's alleged conduct was unlawful interception under the Amended Wiretap Act. *See id.* at 1048. The court also upheld Konop's claim under the Stored Communications Act under a previously adopted theory that unlawful "access" is a lesser included offense of unlawful "interception" that turns on the degree

of intrusion. *See id.* at 1048.[19]

The Ninth Circuit began its analysis with an explanation of the process of communication through a website. That process is similar to the transmission of e-mail. "There is ordinarily a period of latency between the initial transmission of information for storage on a web server, and the acquisition of that information by its recipients," the court explained. *Konop*, 236 F.3d at 1043. In other words, after the sender or owner of the website loads the communication onto the website, the information is transmitted to the web server where it is stored temporarily until an authorized recipient downloads the information from the server onto his personal hard drive. Transmission between the owner of the website and each individual authorized recipient is not complete until the recipient accesses the website and downloads the information from the web server onto his personal hard drive.

Interception of website communication occurs if the communication is acquired by a third party while in the course of transmission, or before it is downloaded by the recipient. Such was the case in *Konop*. When the Vice President of Hawaiian logged on to the website using the name of an authorized recipient, he was able to download the information from the website onto his own hard drive. He acquired the information loaded onto the website by the plaintiff before the authorized recipient retrieved it. The court concluded that "the contents of secure websites are 'electronic communications' in intermediate storage that are protected from unauthorized interception under the Wiretap Act." *Id.* at 1048.

The facts of this case are different from those in *Konop*. Nationwide did not acquire Fraser's e-mail from intermediate storage, or before transmission to the authorized recipient was complete. Nationwide's conduct in this case is analogous to a third party obtaining access to a recipient of Konop's website's hard drive and copying the information that was previously downloaded by the recipient from the web server. In that scenario, as in this case, the information was acquired from storage after transmission is complete, not in the course of transmission. Therefore, there was no "interception".

Neither the Wiretap Act nor the Stored Communications Act cover Nationwide's alleged conduct.[20] The Wiretap Act and the Stored Communications Act, like the original Wiretap Act, provide protection for communication only while it is in the course of transmission. *See Turk*, 526 F.2d at 658–59 ("While Congress clearly was concerned with the protection of individual's privacy interests against unjusti-

---

**19.** *Smith* explained the "lesser included offense" theory as follows:

> "[T]he word "intercept" entails actually *acquiring* the contents of a communication, whereas the word "access" merely involves *being in a position* to acquire the contents of a communication. In other words, "access[]" is, for all intents and purposes, a lesser included offense [] of "intercept[ion]." "

155 F.3d at 1058 (emphasis in original).

> "Under this scheme, the Wiretap Act and the Stored Communications Act do not discriminate between [] communications based on whether they are in transit or storage, but instead attach different conse-

quences to invasions of privacy based on degrees of intrusion." *Konop*, 236 F.3d at 1044.

**20.** The ECPA was enacted in 1986 to provide the same level of protection for private electronic communication as previously provided for wire and oral communication under the original Wiretap Act. *See* 1986 U.S.C.C.A.N. 3555, *2 (explaining that it does not make sense that, with the advent of "large-scale electronic mail operations, computer-to-computer data transmissions," etc., certain means of communication are afforded a greater degree of privacy than others). *See also, Konop*, 236 F.3d at 1035.

fied intrusions, it did not attempt through [the original Wiretap Act] to deal with all such intrusions"). The strong expectation of privacy with respect to communication in the course of transmission significantly diminishes once transmission is complete. *See* Tatsuya Akamine, *Proposal for a Fair Statutory Interpretation: E–Mail Stored in a Service Provider Computer is Subject to an Interception Under the Federal Wiretap Act,* 7 J.L. & Pol'y 519, 528 (1999).

Nationwide's retrieval of Fraser's e-mail from the Nationwide file server may in fact be ethically "questionable" as the Review Board indicated in its report. But it is not legally actionable under the ECPA. Future legislation may delineate the extent of an employer's authorization to access e-mail stored for a period of time after transmission is complete. *See id.* at 206–15 (discussing proposed legislation aimed at protecting workplace e-mail privacy). *See also,* Kent D. Stuckey, *Internet and Online Law,* § 5.03[1] at 5–23 (1996) ("[U]nless legislation or court decisions recognize new employee privacy rights, employers will continue to have the legal right to monitor and read workers' e-mail communications"). However, the ECPA does not provide the protection Fraser seeks. Accordingly, summary judgment will be granted on Counts I, II, III, and IV of the Second Amended Complaint.[21]

## B. Article I, Sections 7 and 20 of Pennsylvania Constitution

Count V of the Second Amended Complaint avers that defendants violated Fraser's rights to free speech and assembly under Article 1 sections 7 and 20 of the Pennsylvania Constitution when Nationwide discharged him for exercising these rights.[22] Defendants move for summary judgment on the basis that plaintiffs have failed to meet the state action requirement necessary for a direct cause of action under Article 1. Plaintiff argues that, unlike under the federal constitution, state action is not required to bring a claim under Article 1 of the Pennsylvania Constitution; "[T]he Pennsylvania Constitution," the plaintiff contends, "reaches private conduct." Plaintiff's Response at 41. Plaintiff incorrectly analyzes Pennsylvania law. Although there still may be instances where the Pennsylvania Constitution reaches private conduct, this case is not one. Because there is no state action in this case, I will grant summary judgment on Count V of the Second Amended Complaint.

Plaintiff cites the 1921 Pennsylvania Supreme Court opinion in *Spayd v. Ringing Rock Lodge No. 665, Brotherhood of Railroad Trainmen of Pottstown,* 270 Pa. 67, 113 A. 70 (1921), in which the court ordered a former union member reinstated who had been expelled for petitioning the state legislature for repeal of a law relating to railroad train crews. After quoting the state constitutional rights of free speech and of petition, the court stated that "[these] rights [ ] cannot lawfully be infringed, even momentarily, by individu-

---

**21.** The parties dispute whether any of the exceptions to liability under the Stored Communications Act apply to the facts of this case. Because I have ruled that the Stored Communications Act does not apply in this case, I will not address the exceptions to liability.

**22.** Section 7 provides that:
"The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty ..."
Section 20 provides that:
"The citizens have a right in a peaceable manner to assemble together for their common good, and to apply to those invested with the powers of government for redress of grievances or other proper purposes, by petition, address or remonstrance."

als, any more than by the state itself." 113 A. at 72 (citing *U.S. v. Cruikshank,* 92 U.S. 542, 23 L.Ed. 588 (1875)). The court went on to express the inherent nature of these rights: "The Constitution does not confer the right, but guarantees its free exercise, . . . and with this kept in view, it is apparent that such a prerogative can neither be denied by others nor surrendered by the citizen himself." *Id.* at 71.

■ The Pennsylvania Supreme Court more recently clarified the import of this early opinion in *Western Pennsylvania Socialist Workers 1982 Campaign v. Connecticut General Life Insurance Co.,* 512 Pa. 23, 515 A.2d 1331 (1986) and explained that, despite the inherent nature of these rights, Article 1 §§ 7 and 20 do not provide a cause of action against a purely private party.[23] In *Western,* a political committee sought a mandatory injunction directing a private owner of a shopping mall to cease interfering with the committee's political activities on the owner's premises. Noting the history of the state constitution, the Pennsylvania Supreme Court concluded that the rights enumerated in Article 1 are "a limitation on the power of state government." *Id.* at 1335. Echoing its opinion in *Spayd,* the court explained that "[t]he Pennsylvania Constitution did not create these rights." *Id.* Rather, these rights are "inherent in man's nature." *Id.* at 1335. Careful not to disturb this fundamental principle, the court explained that it was "not suggesting that the rights enumerated in [Article 1] exist only against the state." *Id.* However, the function of the Pennsylvania Constitution is to "prohibit[ ] the government from interfering with them." *Id.* Distinguishing between the fundamental nature of these rights and the more limited role of the Pennsylvania Constitution, the court concluded that, "the adjustment of these rights among private parties is not necessarily a matter of constitutional dimensions. If it were, significant governmental intrusion into private individuals' affairs and relations would be likely to routinely occur." *Id.* at 1335. "Constitutions, long-lasting and difficult to change, primarily govern relationships between an individual and the state." *Id.* at 1336.[24] The Third

23. Although there is no majority opinion in *Western,* six out of seven justices agreed that there is no constitutional cause of action against purely private parties.

24. The plurality opinion of Pennsylvania Supreme Court in *Western* did leave an opening for unique circumstances in which Article 1 may reach private actors. *Commonwealth v. Tate,* 495 Pa. 158, 432 A.2d 1382 (1981), also relied upon by the plaintiff in his response to summary judgment, presented an example of such circumstances. In *Tate,* the Pennsylvania Supreme Court found that the Pennsylvania Constitution protects an individual's right to freedom of expression at a public forum held on the premises of a private college. The private college, the court found, "holds itself out to the public as a community resource and cultural center, allows members of the public to walk its campus, permits a community organization to use its facilities as a forum for a public official of national im-

portance, and at the same time arbitrarily denies a few members of the public the right to distribute leaflets peacefully." 432 A.2d at 1387.

In *Western,* the plurality distinguished *Tate* and explained that *Tate* "demonstrates a limiting rationale for applying our constitution's rights of speech and assembly to property private in name but used in fact as a forum for public debate." 515 A.2d at 1336. The plurality Supreme Court opinion in *Western* indicates that, in these circumstances, the court would follow the approach applied in *Tate* of balancing the freedom of expression interests of the plaintiff against the property interests of the defendant. The plurality in *Western* implies that the goal is to prohibit arbitrary policies whereby only certain members of the public are prohibited from exercising their rights. *See Western,* 515 A.2d at 1341 (Justice Zappala concurring). Where, however, there is no governmental action or the action did not take place in a public

Circuit and the lower courts of Pennsylvania have interpreted *Western* as an affirmation of a state action requirement under Article 1 of the state constitution. *See, e.g., Cable Investments, Inc. v. Woolley,* 867 F.2d 151 (3rd Cir.1989); *The Professional Insurance Agents Association of Pa., Md., and De., Inc. v. Chronister,* 155 Pa.Cmwlth. 652, 625 A.2d 1314 (1993); *Sabatini v. Reinstein,* 1999 WL 636667 (E.D.Pa.1999) (citing numerous federal cases that have held that there is no private cause of action under sections 7 and 20 of the Pennsylvania Constitution). The Pennsylvania Supreme Court's affirmation in *Western* of the fundamental idea, expressed earlier in *Spayd,* that the rights of free speech, assembly and petition are "inherent and invaluable rights of man" does not undercut the rule of law that a cause of action under Article 1 only exists against a state actor. *Tate,* 432 A.2d at 1388.[25]

■ State action remains the threshold question. Nationwide is a private corporation and a private actor under the law. Plaintiff does not argue in response to summary judgment that Nationwide is a state actor.[26] Therefore, Nationwide's decision to terminate Fraser's Agent's Agreement is not subject to constitutional requirements. Even if it is true that Na-

tionwide terminated Fraser for reporting to government authorities Nationwide's alleged unlawful practices, for drafting the letter to Nationwide's competitors, or for associating with NIICA, conduct that is protected under the Pennsylvania Constitution, Nationwide is not liable under the constitution. Because plaintiff does not have a direct cause of action under Article 1 §§ 7 and 20 of the state constitution, summary judgment will be granted on Count V of the Second Amended Complaint.

### C. Wrongful Discharge

In Count VI of the Second Amended Complaint, plaintiffs bring a claim for wrongful discharge, alleging that Nationwide wrongfully terminated Fraser's Agent's Agreement in retaliation for exercise of his First Amendment rights of expression, association and petition. As defendants argue in summary judgment, Fraser does not have a valid claim for wrongful discharge under the law of Pennsylvania.[27] Therefore, I will grant summary judgment on Count VI of the Second Amended Complaint.

■ Under Pennsylvania law, at-will employment is a well established general

---

forum, there is no need to engage in such a balancing test. *See Western,* 515 A.2d at 1334 n. 2 ("[T]he absence of governmental action on this record makes it unnecessary for us to balance these interests").

**25.** If *Tate* remains good law, a cause of action may also exist against a private party conducting itself as a public forum while arbitrarily infringing on the rights of some. Fraser does not contend that Nationwide imposed such an arbitrary policy. Therefore, I need not further address the continuing vitality of *Tate.*

**26.** Plaintiff implies in paragraph 132 of the Second Amended Complaint that regulation of the insurance industry transforms the con-

duct of the members of the industry into the conduct of the state. To the contrary, the United States Supreme Court has held that "the mere fact that a certain area is highly regulated is not sufficient by itself to establish that a private party covered by such regulation acts under color of state law." *Jackson v. Metropolitan,* 419 U.S. 345, 350, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).

**27.** Defendants alternatively move for summary judgment on the basis that Fraser was an independent contractor, not an employee of Nationwide. Wrongful Discharge is a limited common law cause of action for at-will employees. For purposes of this claim, I will assume that Fraser was an employee of Nationwide.

principle. An employer may terminate an employee for any reason, unless restrained by contract. *See, e.g., McLaughlin v. Gastrointestinal Specialists, Inc.,* 561 Pa. 307, 750 A.2d 283, 286 (2000). The Agent's Agreement signed by Fraser created a contractual relationship between Fraser and Nationwide, but the Agreement expressly stated that either party may terminate the contract at any time. Therefore, assuming that Fraser was an employee, the Agent's Agreement created an at-will employment relationship between Fraser and Nationwide. *See Somers v. Somers,* 418 Pa.Super. 131, 613 A.2d 1211 (1992) (construing an employment contract that specified no term of employment as an at-will employment relationship).

 The Pennsylvania courts have established a narrow exception to the at-will employment doctrine by allowing "a wrongful discharge claim in circumstances where a termination of an employee would violate a "clear mandate of public policy." " *McLaughlin,* 750 A.2d at 286 (citing *Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974)). In *Geary,* the Pennsylvania Supreme Court held that an employee who claimed that he had been discharged in retaliation for having pointed out to his superiors the unsafe nature of certain products used by his employer had not presented a claim for wrongful discharge. In dicta, the court opened the door to a limited public policy exception to the at-will employment doctrine. The court acknowledged:

> "It may be granted that there are areas of an employee's life in which his employer has no legitimate interest. An intrusion into one of these areas by virtue of the employer's power of discharge might plausibly give rise to a cause of action, particularly where some recognized facet of public policy is threatened."

*Geary,* 319 A.2d at 180. Finding that the facts in *Geary* did not warrant such an exception, however, the court declined to establish the perimeters of this exception. The court concluded:

> "We hold only that where the complaint itself discloses a plausible and legitimate reason for terminating an at-will employment relationship and no clear mandate of public policy is violated thereby, an employee at will has no right of action against his employer for wrongful discharge."

*Id.*

 Since *Geary,* state and federal courts applying Pennsylvania law have consistently reiterated the strong presumption of at-will employment and consequently the highly limited nature of the public policy exception. The Pennsylvania Supreme Court recently confirmed this principle in *McLaughlin.* 561 Pa. 307, 750 A.2d 283. The presumption that all noncontractual employment relationships are at-will is, the court affirmed, "an extremely strong one." 750 A.2d at 287. "An employee will be entitled to bring a cause of action for a termination of that relationship only in the most limited of circumstances where the termination implicates a clear mandate of public policy in [the Commonwealth of Pennsylvania]." *Id.* The Pennsylvania Supreme Court reiterated that: "As our previous jurisprudence has shown, this Court has steadfastly resisted any attempt to weaken the presumption of at-will employment in this Commonwealth." 750 A.2d at 290. It is plaintiff's burden to overcome this strong presumption by pointing to a clearly mandated public policy of the Commonwealth of Pennsylvania. *See, e.g., Clark v. Modern Group Ltd.,* 9 F.3d 321 (3rd Cir.1993).

 Fraser alleges that Nationwide terminated him in retaliation for his First

Amendment activities, including his reports to Pennsylvania authorities of Nationwide's alleged unlawful practices, his leadership role in NIICA, and his role in drafting the letter to Nationwide's competitors. He further alleges that Nationwide terminated him to send a warning message to other NIICA members to cease all conduct that management believed to be harmful to Nationwide. Fraser asserts that the evidence supporting these allegations creates a sufficient dispute of fact as to Nationwide's true motivation for his termination. He argues that a reasonable jury could find that Nationwide terminated Fraser to cease his First Amendment activities, thereby establishing a valid claim for wrongful discharge in violation of public policy.

The ultimate inquiry after *McLaughlin* is whether allowing Nationwide to terminate Fraser under the circumstances presented in this case significantly undermines the public policy of Article I of the Pennsylvania Constitution.[28] *See* 561 Pa. 307, 750 A.2d 283. Fraser relies exclusively on the Third Circuit opinion in *Novosel v. Nationwide Insurance Co.*, 721 F.2d 894 (3rd Cir.1983) to argue that Nationwide's decision to terminate Fraser falls within the public policy exception to at-will employment. *Novosel* was decided by the Third Circuit after *Geary*, but before the Pennsylvania Supreme Court revisited the issue of a possible exception to the at-will employment doctrine. In *Novosel*, the Third Circuit held that an employee who

was allegedly discharged for his refusal to participate in his former employer's political lobbying effort and the employee's privately stated opposition to the company's political position had stated a claim for wrongful discharge under the public policy exception. The court found a basis for public policy in either the First Amendment of the Constitution or Article 1, § 7 of the Pennsylvania Constitution.[29] 721 F.2d at 899.

Subsequent opinions by the Pennsylvania courts and the courts of the Third Circuit have narrowly limited the *Novosel* holding to its facts. *See, e.g., Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 620 (3rd Cir.1992) (interpreting *Novosel* to have held "that using the power of discharge to coerce employees' political activity violates public policy"); *Levito v. Hussmann Food Service Co., Victory Refrigeration Division*, 1991 WL 86898 (E.D.Pa.1991) (holding that *Novosel* applies only to coerced political activity and does not extend to more generalized speech and expression); *Martin v. Capital Cities Media, Inc.*, 354 Pa.Super. 199, 511 A.2d 830 (1986) (rejecting a claim that public policy was violated based on alleged retaliation for free expression activities and explaining that free speech is limited in the employment context). *See also, Lee v. Wojnaroski*, 751 F.Supp. 58 (W.D.Pa. 1990); *McDaniel v. American Red Cross, Johnstown Region*, 58 F.Supp.2d 628 (W.D.Pa.1999).[30]

---

**28.** The state constitutional rights of freedom of expression, freedom of petition, and freedom of association are established by Article 1 §§ 7 and 20 of the Pennsylvania Constitution.

**29.** It should be noted that the Third Circuit accepted these constitutional provisions as statements of public policy in the context of a private employment dispute. State action was not required for the purposes of stating a

wrongful discharge claim under the public policy exception.

After McLaughlin, a state constitutional provision may form the basis of public policy. *See McLaughlin*, 750 A.2d at 288.

**30.** On the four occasions in which the Pennsylvania Supreme Court revisited the public policy exception to the at-will doctrine after *Novosel* was decided, it failed to mention the case or take the opportunity to affirm its

The facts presented in this case are distinguishable from the facts in *Novosel.* Reading the evidence in the light most favorable to the plaintiff, Nationwide terminated Fraser because of his reports to state authorities of Nationwide's alleged unlawful practices, his leadership role in NIICA, and his responsibility for drafting the letter to Nationwide's competitors. Even if this is true, however, this case is not analogous to an employee being forced to engage in the employer's political activities, as was the case in *Novosel.* Freedom of expression is not an absolute right in the employment context and is frequently balanced against interests of the employer. *See, e.g., Martin,* 511 A.2d at 842 (warning that allowing a cause of action for wrongful discharge based on freedom of expression "would be tantamount to transferring management decisions to the judicial forum"); 11 West's Pa. Forms § 5.15 ("constitutional protection of free speech is not generally applicable to private employers"). Thus, even if Nationwide terminated Fraser solely for the purpose of discouraging these particular First Amendment activities, the courts will not second guess Nationwide's decision to exercise its right under the at-will employment doctrine to terminate its relationship with Fraser.

In light of the limited nature of Article 1 rights in the employment context and the clear mandate from the Pennsylvania Supreme Court to resist further weakening the presumption of at-will employment with broad public policy exceptions, I find no basis for concluding that Fraser has overcome the presumption of at-will employment. Fraser has presented no evidence to suggest that Nationwide's termi-

nation of his Agent's Agreement violated a clear mandate of public policy in the state of Pennsylvania. Under the strong presumption for at-will employment, Nationwide was free to terminate Fraser's contract for any reason or no reason. Therefore, I will grant summary judgment on Count VI of his Second Amended Complaint for wrongful discharge.

**D. Breach of Implied Covenant of Good Faith and Fair Dealing**

In Count VII of the Second Amended Complaint, plaintiff asserts a claim for Breach of the Implied Covenant of Good Faith and Fair Dealing. Specifically, the plaintiff argues that defendants breached an implied covenant of good faith when Nationwide (1) exercised its right to cancel Fraser's Agent's Agreement; and (2) rendered the Review Board process, available to agents for review of a termination, a sham. *See* Plaintiff's Response at 62. Plaintiff's claim fails on both accounts.

 Under Pennsylvania Law, a covenant of good faith and fair dealing is implied in every contract. *See Baker v. Lafayette College,* 350 Pa.Super. 68, 504 A.2d 247, 255 (1986), *aff'd, Baker v. Lafayette College,* 516 Pa. 291, 532 A.2d 399 (1987). However, it does not create a cause of action in every case. *See Parkway Garage Inc. v. City of Philadelphia,* 5 F.3d 685, 701 (3rd Cir.1993). Pennsylvania does not recognize this implied covenant as an exception to the at-will employment doctrine. *See* previous discussion of the narrow exception to the at-will employment doctrine. In other words, an employee claiming wrongful termination may not restate the claim as one for breach of the implied covenant of good faith and fair

holding. *See Clay v. Advanced Computer Applications,* 522 Pa. 86, 559 A.2d 917 (1989); *Paul v. Lankenau Hospital, et al.,* 524 Pa. 90, 569 A.2d 346 (1990); *Shick v. Shirey,* 552 Pa.

590, 716 A.2d 1231 (1998); *McLaughlin v. Gastrointestinal Specialists, Inc.,* 561 Pa. 307, 750 A.2d 283 (2000).

dealing. In the first part of this claim, Fraser restates his claim for wrongful discharge, challenging Nationwide's decision to cancel his Agent's Agreement. The Third Circuit reviewed state law on this issue in *Northview Motors, Inc. v. Chrysler Motors Corp.* and held that "a party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are "identical to" a claim for "relief under an established cause of action." " 227 F.3d 78, 92 (2000) (quoting *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 701–02 (3rd Cir.1993)). The Pennsylvania Superior Court agreed. *See Donahue v. Federal Express Corporation,* 753 A.2d 238, 243 (Pa.Super.2000) (holding that an employee "cannot as a matter of law maintain an action for breach of the implied duty of good faith and fair dealing, insofar as the underlying claim is for termination of an at-will employment relationship")

Furthermore, the implied duty of good faith and fair dealing does not override express terms of the contract. *See Northview Motors,* 227 F.3d at 91. The Agent's Agreement signed by Fraser expressly states that the agreement may be terminated by either party for any reason. Fraser failed to make out a claim for wrongful discharge based on the limited public policy exception to the at-will employment doctrine. Fraser may not circumvent this doctrine, the law, and the terms of the Agreement by proceeding with the same factual allegations under a cause of action for breach of an implied covenant of good faith and fair dealing. The first part of Fraser's claim under Count VII, that Nationwide breached an implied covenant of good faith when Nationwide exercised its right to cancel Fraser's Agent's Agreement, fails.

■ Fraser also claims that Nationwide breached the implied covenant of good faith by rendering the Review Board process a sham. Plaintiff avers in the Second Amended Complaint that Nationwide's "Compensation and Security Handbook" ("CASH"), which details procedures and composition of Review Boards, is part of the Agent's Agreement. Plaintiff further avers that, according to the CASH, "[u]pon request of an "Independent Contract Agent" for a Review Board Hearing, cancellation procedures are to be suspended until a final decision is made. The Review Board's decision must be unanimous." Second Amended Complaint ¶¶ 170–173. In its motion for summary judgment, defendants quote language from the CASH which unambiguously states that the Handbook is not part of the contract and shall not be construed as a contract. Defendant's Motion, p. 62. Plaintiff failed to respond to summary judgment on this matter and cites no evidence in the record, either in his complaint or in his response to summary judgment, that contradicts the plain language of the CASH.

■ An employee handbook or manual "only forms the basis of an implied contract," under Pennsylvania law, "if the employee shows that the employer affirmatively intended that it do so." *Jacques v. Akzo International Salt, Inc.,* 422 Pa.Super. 419, 619 A.2d 748, 753 (1993) (citing *Morosetti v. Louisiana Land and Exploration Co.,* 522 Pa. 492, 564 A.2d 151 (1989)). *See also, Mudd v. Hoffman Homes for Youth, Inc.,* 374 Pa.Super. 522, 543 A.2d 1092, 1096 (1988) ("in order for a handbook to be construed as a contract 'it must contain unequivocal provisions that the employer intended to be bound by it' " (quoting *Reilly v. Stroehmann Bros. Co.,* 367 Pa.Super. 411, 532 A.2d 1212, 1214 (1987))). Plaintiff has failed to cite evidence that Nationwide intended to bound by the CASH. Therefore, I must assume that Nationwide's contractual obligation is

limited to the terms of the Agent's Agreement. Fraser's claim that Nationwide breached an implied covenant of good faith by rendering the Review Board process a sham must rest on the terms of the Agent's Agreement that state: "the Agent shall have access to the Agents' Administrative Review Board, and its procedures, as it may exist from time to time." Appendix, Vol. 1 at 1.

 An employee may maintain a cause of action for breach of implied covenant of good faith where the employer did not fulfill some contractual obligation that the employer had assumed beyond the at-will employment relationship. *See Donahue*, 753 A.2d at 242 (interpreting *Somers v. Somers*, 418 Pa.Super. 131, 613 A.2d 1211 (1992), *appeal denied*, 624 A.2d 111 (1993)). In *Somers*, for example, the plaintiff successfully sought compensation owed under the contract that was independent of continuation of the employment relationship. *See* 418 Pa.Super. 131, 613 A.2d 1211.

However, where, as here, the employee is claiming breach of the implied covenant of good faith with respect to employer's failure to fairly conduct the review process that determines the employee's continued or future employment, courts have dismissed the claim because the employee is without a remedy. *See Baker*, 504 A.2d at 256. In *Baker*, a college professor, whose two year appointment was not renewed, brought an action against the college for breach of contract with respect to the school's good faith duty to conduct a review of his performance at the end of the two years. The court dismissed Baker's claim, stating that:

> "[E]ven if [he] had received the most favorable evaluation possible, he would not be contractually entitled to reap-

pointment; he would simply merit "consideration." The College still retained the freedom not to rehire him; Baker had no contractual right to reappointment under any circumstances."

*Id.*[31] Under these circumstances, the court refused to conduct a de novo review of the school's decision "[u]nder the guise of "good faith."" *Id. Baker* was affirmed by the Pennsylvania Supreme Court. *See* 516 Pa. 291, 532 A.2d 399 (1987).

The Third Circuit earlier anticipated the analysis in *Baker* in the context of an employee's action seeking damages against his former employer for the employer's failure to offer him a permanent position after terminating a temporary position. *See Bruffett v. Warner Communications, Inc.*, 692 F.2d 910 (3rd Cir.1982). The court held that "the plaintiff's breach of contract claim must fail unless some modification of Pennsylvania's adherence to the discharge at will doctrine could be predicted, since it would be to no avail to plaintiff to claim breach of an express contract of employment which would have been terminable immediately thereafter at the option of the employer". 692 F.2d at 913. The federal district court more recently applied the analysis in *Baker* in *Linson v. Trustees of the University of Pennsylvania*, 1996 WL 479532 (E.D.Pa.1996), *aff'd*, 205 F.3d 1329 (3rd Cir.1999) (holding that a graduate student who was dropped from university rolls for failing to register did not have a claim for breach of implied covenant of good faith for university's refusal to readmit him, because the student had no contractual right to reinstatement). Where an employee is claiming breach of contract with respect to the review process that determines the employee's continued or future employment, the employee is without a remedy where reinstatement or continued employment is terminable at any

---

**31.** It is not clear from the opinion what kind of relief Baker was seeking.

time at the will of the employer. In this case, even if a jury were to find that Nationwide breached its obligation under the Agent's Agreement to provide access to the Review Board upon termination of the agreement, Nationwide retained the right to terminate Fraser at any time. Fraser's claim for breach of implied covenant of good faith based on Nationwide's alleged conduct rendering the Review Board process a sham, therefore, must fail. Summary judgment will be granted on Count VII of the Second Amended Complaint.

### E. Breach of Contract and Unconscionability

In Count IX of the Second Amended Complaint, plaintiff brings a claim for Breach of Contract and Unconscionability. Specifically, the plaintiff alleges: (1) Nationwide violated the provision of the Agent's Agreement that provides an agent access to the Review Board upon termination of his Agent Agreement; (2) the Agent's Agreement is unconscionable, and (3) Nationwide has breached the Agreement by failing to pay Fraser his earned deferred compensation due under paragraph 11 of the Agreement.

The first part of this claim relies on Fraser's assumption in the Second Amended Complaint that the CASH is part of the contract between the parties. Fraser asserts a claim for commissions due for the period from his notice of cancellation on September 2, until the Tolmsa letter on September 21, based on a provision of the CASH that suspends cancellation of the Agreement until a final decision by the Review Board is made. *See* ¶¶ 173–76 of Second Amended Complaint. As explained above in my discussion of Count VII, based on the record, the CASH is not part of the contract between the parties. Therefore, summary judgment on Count IX of the Second Amended Complaint with respect to the first part of plaintiff's breach of contract claim, ¶¶ 169–177 of the Second Amended Complaint, is granted.

With respect to the claim of unconscionability, plaintiff fails to respond to defendants' argument that the Agent's Agreement is not unconscionable because both parties held the right to cancel the contract at any time for any reason and both parties entered into the agreement with a full understanding of its effect. It is a firmly established principle of Pennsylvania law that one who enters a contract "should do so only after due reflection of the possible consequences ... that could have been expected by a reasonably intelligent man," and "he cannot rely on the law to remedy his fecklessness." *New Charter Coal Co. v. McKee*, 411 Pa. 307, 191 A.2d 830, 833 (1963). *See also, Field v. Golden Triangle Broadcasting, Inc.*, 451 Pa. 410, 305 A.2d 689 (1973) (rejecting a claim of unconscionability based on the principle stated in *McKee*). Fraser testified in his deposition that he entered into the Agent's Agreement with full understanding and with the intent of being an independent contractor with the right to cancel the agreement at any time. Therefore, summary judgment with respect to plaintiff's claim of unconscionability in Count IX will be granted.

What remains of Count IX is plaintiff's claim for his earned deferred compensation due under paragraph 11 of the Agent's Agreement. Paragraph 11 of the Agreement provides for "Computation of Deferred Compensation Incentive Credits." *See* Plaintiff's Appendix Vol. 1 p. 3. Paragraph 11(f), referred to as the "forfeiture-for-competition" clause, further provides that "[a]ll liability of [Nationwide] provided for in paragraph 11 and its subparagraphs shall cease and terminate in

the event any one of the following shall occur:

> (1) You either directly or indirectly, by and for yourself or as an agent for another, or through others as their agent, engage in or be licensed as an agent, solicitor, representative, or broker or in anyway be connected with the fire, casualty, health, or life insurance business, within one year following cancellation within a 25 mile radius of your business location at that time;"

*Id.* at 5. Plaintiff admits to accepting work for a competitor of Nationwide ten months after the cancellation of his agreement with Nationwide. *See* Plaintiff's Response at 66. Plaintiff asserts, however, that the forfeiture provision in paragraph 11(f) is not enforceable under the law because Fraser's agreement with Nationwide was involuntarily terminated. *See id.* at 63–66. Plaintiff's assertion is not supported by Pennsylvania law.

■■■ As stated by both parties, forfeiture-for-competition provisions, as they pertain to compensation upon termination of employment, are generally enforceable under Pennsylvania law. *See Garner v. Girard Trust Bank,* 442 Pa. 166, 275 A.2d 359 (1971). The Pennsylvania courts have analyzed such provisions according to the three-part test applied to covenants not-to-compete or "restrictive covenants". *See Bilec v. Auburn & Associates, Inc. Pension Trust,* 403 Pa.Super. 176, 588 A.2d 538 (1991), *appeal denied,* 597 A.2d 1150 (1991). Accordingly, a forfeiture-for-competition clause will be upheld if it: (1) relates to a contract for employment; (2) is supported by adequate consideration; (3) its application is reasonably limited in both time and territory. *See id.,* 588 A.2d at 541 (citing *Piercing Pagoda, Inc. v. Hoffner,* 465 Pa. 500, 351 A.2d 207 (1976)).

■■■ Plaintiff relies on case law from other state appellate courts to argue that, where an employee/agent has been involuntarily discharged, the forfeiture provision is not enforceable. *See* Plaintiff's Response at 65. For example, the Massachusetts Appellate Court assessed the validity of a forfeiture-for-competition provision pertaining to deferred compensation benefits and held that, "if the discharge is inequitable, an otherwise reasonable restraint may not be enforced." *Kroeger v. Stop & Shop Companies, Inc.,* 13 Mass. App.Ct. 310, 432 N.E.2d 566, 572 (1982), *review denied,* 386 Mass. 1102, 440 N.E.2d 1175 (1982). By "inequitable discharge", the court meant "circumstances involving no misconduct by the employee," such as, a personality conflict with management. *Id.* Similarly, in *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al.,* the New York Court of Appeals distinguished between voluntary and involuntary termination, striking as void a forfeiture-for-competition clause "where the termination of employment is involuntary and without cause." 48 N.Y.2d 84, 421 N.Y.S.2d 847, 397 N.E.2d 358, 360 (1979). In both cases, the state courts qualified earlier precedent upholding forfeiture clauses, relying in part on the recent Congressional statement of public policy against forfeiture of employee benefits expressed in the Employee Retirement Income Security Act of 1974 (ERISA). 29 U.S.C. § 1001 *et seq.* Relying on these opinions from other state courts, plaintiff asserts that "without regard to the viability of plaintiff's claims under the Wiretap Act, *Novosel,* and the Pennsylvania Constitution, plaintiff has a claim to recover his deferred compensation if the jury ultimately finds his termination was without cause." Plaintiff's Response at 66.

Although the Pennsylvania courts have not yet faced the question of the validity of

a forfeiture-for-competition clause under circumstances of involuntary termination, there is no indication in Pennsylvania case law that such a distinction between voluntary and involuntary termination would be upheld by the Pennsylvania courts. In *Pollard v. Autotote, Ltd.,* 852 F.2d 67 (3rd Cir.1989), the Third Circuit instructs on the proper approach for analyzing this precise issue in the absence of controlling state court precedent. In *Pollard,* the Third Circuit was asked to decide whether a forfeiture-for-competition clause was enforceable under Delaware law against an employee who was involuntarily terminated, in the absence of dispositive Delaware case law. The plaintiff in *Pollard* argued on the basis of the New York opinion in *Post* that the provision was not enforceable. *See* 852 F.2d at 70. Rather than relying on *Post,* the Third Circuit turned for guidance to cases in which Delaware courts examined the enforceability of a non-competition clause in an employment contract and applied the same test applied in those cases, i.e. basic contract principles followed by a "reasonableness standard." *See id.* at 70–72. Informed of the contrary holdings by other states in both *Kroeger* and *Post,* the Third Circuit confirmed that "[b]ecause of the similarity between the enforceability of a forfeiture-for-competition provision ... and a covenant not to compete in an employment contract, ... we believe that the Delaware courts would apply the same test of reasonableness in both contexts." *Id.* at 72 (citing *Kroeger,* 13 Mass.App.Ct. 310, 432 N.E.2d 566).

Forfeiture-for-competition provisions are analyzed under Pennsylvania law according to the three-prong test for restrictive covenants outlined above. In *Bilec,* decided after all of the cases in other states relied upon by the plaintiff, the Pennsylvania Superior Court assessed the validity of a forfeiture-for-competition clause under the three-prong test. *See* 403 Pa.Super. 176, 588 A.2d 538 (1991). Although not faced with the circumstances of involuntary termination, the court in *Bilec* did reason in light of the Congressional policy statement expressed in ERISA and stated, "[w]e are not in agreement with the appellants' blanket contention that all pre-ERISA forfeiture clauses are violative of the public policy of this Commonwealth." *Id.* at 540. The Superior Court followed the three-prong test applied to restrictive covenants and found the clause not enforceable because it did not include any time or geographical restrictions. *See id.* at 542–3 (distinguishing the clause from the one upheld in *Garner* that was limited to a two year time period). Under this Pennsylvania precedent and guidance from the Third Circuit, I need not speculate as to whether the Pennsylvania courts would follow the rule of *Post* or *Kroeger.*

■■■ There is sufficient information in the record from which to conclude that the forfeiture-for-competition clause stated in paragraph 11(f) of the Agent's Agreement signed by Fraser is valid and enforceable under Pennsylvania law. First, the clause is ancillary to the Agent's Agreement with a main purpose of establishing the independent contractor relationship between Fraser and Nationwide. It is irrelevant that Fraser was employed by Nationwide prior to signing the agreement, because the clause is still ancillary to a contract with an independent main purpose of establishing the independent contractor relationship between the parties. *See Jacobson & Co. v. International Environment Corp.,* 235 A.2d 612 (1967). Second, the record reveals that there was adequate consideration in the form of a change of status in Fraser's relationship

with Nationwide.[32] *See Maintenance Specialties, Inc. v. Gottus,* 455 Pa. 327, 314 A.2d 279, 281 (1974) (a covenant will be enforced if new consideration in the form of a corresponding benefit to the employee or beneficial change in employment status is received). Third, the restriction on competition is reasonably limited to one year following cancellation of the agreement and a 25 mile radius of Fraser's business location at the time of cancellation. In light of Fraser's expertise as an agent and the special relationship that he acquired with Nationwide's policyholders, this narrowly proscribed restriction is reasonably tailored to protect Nationwide's legitimate business interests and impose minimal hardship on a former agent. *See Morgan's Home Equipment Corp. v. Martucci,* 390 Pa. 618, 136 A.2d 838 (1957).

According to the three-part analysis prescribed by the Pennsylvania courts, the forfeiture clause of paragraph 11(f) of the Agent's Agreement signed by Fraser is valid and enforceable, and Nationwide is relieved of all liability to Fraser for deferred compensation. Accordingly, I will grant summary judgment on Count IX for breach of contract.

An appropriate order follows.

### ORDER

**AND NOW,** this 27th day of March, 2001, after careful consideration of Defendants' Motion for Summary Judgment and Plaintiff's Response, it is **ORDERED** that Defendants' Motion (docket entry # 63) is **GRANTED.**

---

**32.** Regardless of whether or not Fraser can establish that Nationwide has recently implemented policy changes undermining his independence and altering his status as an independent contractor, the record establishes and Fraser admits that his signing of the Agent's Agreement corresponded with a change in his status.